## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **FM GLOBAL TECHNOLOGIES L.L.C.,** formerly known as **FACTORY MUTUAL RESEARCH CORP.,** | **No. 05-11226 MLW** |
| **Plaintiff,** | |
| **v.** | |
| **RANTEC POWER SYSTEMS, INC.,** | |
| **Defendant.** | |

### DEFENDANT RANTEC POWER SYSTEMS, INC., NOW KNOWN AS ETS LINDGREN, L.P.,'s ANSWER TO COMPLAINT, COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Now comes the Defendant, Rantec Power Systems, Inc., now known as ETS LINDGREN, L.P., ("ETS") and answers Plaintiff, FM Global Technologies, L.L.C., formerly known as Factory Mutual Research Corporation's Complaint as follows:

1.     ETS has insufficient information to admit or deny that allegations in Paragraph 1 and, on that basis, denies the allegations set forth in Paragraph 1.

2.     ETS denies the allegations set forth in Paragraph 2, and further states that it was formerly known as RANTEC POWER SYSTEMS, INC., and now is a Texas limited partnership with its principal place of business located in Cedar Park, Texas.

3.     ETS has insufficient information to admit or deny the allegations in Paragraph 3 and, on that basis, denies the allegations set forth in Paragraph 3.

4.  ETS has insufficient information to admit or deny the allegations in Paragraph 4 and, on that basis, denies the allegations set forth in Paragraph 4.

5.  ETS admits, on information and belief, that venue is proper in the District of Massachusetts, as well as in the Northern District of California as set forth in Paragraph 5.

6.  ETS has insufficient information to admit or deny the allegations in Paragraph 6 and, on that basis, denies the allegations set forth in Paragraph 6.

7.  ETS admits the allegations set forth in Paragraph 7.

8.  ETS admits the allegations set forth in Paragraph 8.

9.  ETS has insufficient information to admit or deny the allegations in Paragraph 9 and, on that basis, denies the allegations set forth in Paragraph 9.

10.  ETS admits the allegations set forth in Paragraph 10.

11.  ETS has insufficient information to admit or demy the allegations in Paragraph 11, and on that basis, denies the allegations set forth in Paragraph 11.

12.  ETS denies the allegations set forth in Paragraph 12.

13.  ETS admits the allegations set forth in Paragraph 13.

14.  ETS admits the allegations set forth in Paragraph 14.

15.  ETS admits the allegations set forth in Paragraph 15.

16.  ETS admits the allegations set forth in Paragraph 16.

17.  ETS has insufficient information to admit or deny the allegations in Paragraph 17 and, on that basis, denies the allegations set forth in Paragraph 17.

18.  ETS admits the allegations set forth in Paragraph 18.

19.  ETS denies the allegations set forth in Paragraph 19.

20.  ETS admits the allegations set forth in Paragraph 20.

21.    Paragraph 21 of the Complaint is for information purposes only and does not require an answer on behalf of this answering Defendant.

22.    ETS denies the allegations set forth in Paragraph 22.

23.    ETS admits that it filed third party complaints against Factory Mutual Research Corporation in the Merrimack actions, the allegations of which speak for themselves. To the extent not specifically admitted, ETS denies the allegations set forth in Paragraph 23.

24.    ETS has insufficient information to admit or deny the allegations in Paragraph 24 and, on that basis, denies the allegations set forth in Paragraph 24.

25.    ETS denies the allegations set forth in Paragraph 25.

26.    ETS denies the allegations set forth in Paragraph 26. ETS admits that it has not paid any of Factory Mutual Research Corporation's demands for indemnification.

27.    ETS denies the allegations set forth in Paragraph 27.

28.    ETS denies the allegations set forth in Paragraph 28.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff has failed to state a claim for which relief can be granted, thus Plaintiff's Complaint and the count purportedly alleged therein is barred by Federal Rule of Civil Procedure, Rule 12(b)(6).

### SECOND AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff has failed to name necessary and/or indispensable entities and/or persons as parties to its Complaint.

### THIRD AFFIRMATIVE DEFENSE

ETS alleges that the count purportedly alleged in Plaintiff's Complaint is time barred by applicable provisions of the Massachusetts General Laws with regard to statutes of limitations.

### FOURTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff has failed to mitigate its damages as a result of a failure to use due diligence and/or reasonable efforts used by persons acting under similar circumstances and that such failure serves to either eliminate, or reduce, Plaintiff's recovery, if any, as against ETS.

### FIFTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred by Federal Rule of Civil Procedure, Rule 13.

### SIXTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred by the doctrines of waiver or estoppel.

### SEVENTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred by the doctrine of laches.

### EIGHTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred by the doctrine of unclean hands.

### NINTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred and the contract attached to the Complaint is void due to fraud in the inducement.

## TENTH AFFIRMATIVE DEFENSE

ETS alleges that Plaintiff's Complaint and the count purportedly alleged therein is barred and the contract attached to the Complaint is void due to illegality of the contract.

## ELEVENTH AFFIRMATIVE DEFENSE

ETS reserves the right to assert additional affirmative defenses and matters in avoidance as may be disclosed through investigation and discovery.

WHEREFORE, ETS prays for judgment and further relief as follows:

1.    Plaintiff take nothing from its Complaint against ETS and that judgment be entered against Plaintiff and in favor of ETS;

2.    For the rescission of the contract between the parties;

3.    For costs of suit herein; and

4.    For such other and further relief as the Court may deem just and proper.

## COUNTERCLAIM
## AND THIRD PARTY COMPLAINT

### PARTIES

1.        ETS, a Texas limited partnership, has its principal place of business in Cedar Park, Texas. ETS is the successor in interest to Rantec Power Systems, Inc., formerly known as Rantec Microwave & Electronics, Inc., ("Rantec" for all purposes hereafter), which, at all times relevant, was a Delaware corporation, licensed to do, and was doing business in the State of California.

2.        Rantec is informed and believes and thereon alleges that Defendant-in-Counterclaim, FM Global Technologies LLC ("FMGT"), also known as FM Approvals, is the successor in interest to Factory Mutual Research Corporation (hereafter collectively referred to as "FMRC"), a corporation, with its principal place of business in Norwood, Massachusetts.

3.        Rantec is informed and believes and thereon alleges that Third-Party Defendant, Factory Mutual Insurance Company ("FMIC"), a corporation, is the successor to three large commercial and industrial property insurers: Allendale Mutual Insurance Company ("Allendale"), Arkwright Mutual Insurance Company and Protection Mutual Insurance Company, with its principal place of business in Norwood, Massachusetts. Included within the definition of FMIC is Factory Mutual Engineering Association ("FMEA") a Massachusetts unincorporated association of FMIC whose business purpose was to provide property loss prevention, control engineering, and loss adjustments for the benefit of FMIC and its customers, clients and insureds.

4.        At all times relevant, Rantec is informed and believes, and thereon alleges that Third-Party Defendant FMRC, is an organization that was and is the joint venturer and/or alter ego of, and is owned and/or directed by FMIC.

5.        Upon information and belief, Third-Party Defendants, John Does 1 through 20, at all times relevant, were joint venturers with, and/or alter egos of, and/or owned by, and/or affiliated with, and/or directed by, FMRC and/or FMIC, and participated in the wrongful conduct that is the subject of this counterclaim.

6.        At all times relevant, Rantec is informed and believes and thereon alleges that the business purpose of FMRC is to provide research and testing expertise and facilities for purposes of the development, testing and approval of reliable products, systems and techniques to mitigate property loss in different industries. Such reliable products, systems and techniques include, but are not limited to, fire suppression products, systems, and techniques.

7.        At all times relevant, FMRC held itself out as having expertise in the design and testing (including the manufacturing implications related thereto) of fire suppression systems, and components thereof, for anechoic chambers, including but not limited to anechoic chambers employing Telescoping Sprinkler Assemblies ("TSA") as an integral component of fire suppression.

8.          Rantec is informed and believes, and thereon alleges that, at all times relevant herein, each of the Defendants-in-Counterclaim and Third-Party Defendants sued herein was the partner, joint venturer, subsidiary, agent, employee or co-conspirator with each other and was, in doing the things herein alleged, or as may be proven, in the course and scope and furtherance of such partnership, joint venture, agency, employment, agreement or conspiracy and therefore, is responsible to Rantec as hereinafter alleged.

9.          Rantec hereby incorporates by reference the material allegations of the Complaint filed herein by FM Global Technologies, LLC, without admitting to any such allegations that are not expressly admitted in Rantec's Answer, and denying all other allegations therein.

## GENERAL ALLEGATIONS

### Procedural History

10.          Rantec was sued by Lockheed Martin Corporation ("Lockheed") as a Defendant in the United States District Court for the Northern District of California, Action No. 00-CV-20002, for alleged negligence, strict products liability, and breach of implied warranties as a result of alleged damage to Lockheed's Large Compact Range anechoic chamber ("LCR)" in Sunnyvale, California and its Tapered Anechoic Chamber located at Lockheed's Sanders facility in Merrimack, New Hampshire (hereinafter the "Chambers").

11.          The claims related to Lockheed's Tapered Range Chamber at its Sanders facility in Merrimack, New Hampshire, were later severed from the above-mentioned action and transferred to the United States District Court for the District of Massachusetts and assigned Action No. 00-CV11818 JLT

### Anechoic Chambers, Fire Suppression, and Telescoping Sprinkler Assemblies

12.          An anechoic chamber is a facility designed to test objects for electromagnetic emissions, electromagnetic immunity, and radio frequencies by isolating the radio frequencies and other electromagnetic waves. The ability to isolate radio frequencies and electromagnetic waves is created by the utilization of a shielded enclosure covered internally with anechoic foam

absorber. The absorber foam is pyramidal in shape, varies in size, and is highly flammable. High value test objects, such as satellites or antennas, are typically suspended within the chamber.

13.    Because of the flammability of the absorber foam and the value of the test objects, fire suppression systems are an integral safety component of any anechoic chamber.

14.    At all times relevant, Rantec manufactured TSAs for use in anechoic chamber fire suppression systems. Rantec's TSAs have a number of components, primarily consisting of an outer cylinder assembly and an internal piston assembly, both made of stainless steel. The internal piston assembly is held in place inside the outer cylinder assembly by two O-rings affixed below a welded collar and above a shock absorber installed on the internal piston assembly. Rantec's TSAs range in retracted length from 5" to 7'.

15.    TSAs are typically retracted above the ceiling of an anechoic chamber, with the outer cylinder affixed to piping connected to a water source. A sprinkler head is affixed to the threaded end of the internal piston assembly.

16.    The sprinkler heads affixed to the threaded end of the internal piston assembly were, at all times relevant, manufactured by others. Rantec has never designed, tested, or manufactured sprinkler heads for use with its TSAs.

17.    Anechoic chambers that incorporate a water-based fire suppression system using TSAs generally fall into two categories; "deluge" or "pre-action" systems. In a deluge system, the piping system and the TSAs are always filled with water. When a fire alarm is activated, a deluge valve is activated, or "tripped," and pressurized water is introduced into the system, with the resulting increase in water pressure sufficient to dislodge the inner piston of the TSA, causing it to extend into place. The sprinkler head at the end of the inner piston assembly has a deflector plate that forces water coming out of the sprinkler to spread in a 360° radius.

18.    In a pre-action system the piping to which the TSA is attached is filled with air. When the system is activated the deluge valve is tripped, allowing pressurized water to enter the piping system, which, in turn, compresses the air in the piping. The increase in air pressure in

the piping dislodges the inner piston of the TSA, causing it to extend into place. Water is not released into the chamber until the temperature rises to a level that melts a fusible link built into the sprinkler head. Once the fusible link melts, water coming out of the sprinkler hits the deflector plate, spreading the water in a 360° radius.

19.     The pyramidal design of the anechoic foam results in valleys between each piece of anechoic foam. Because of the sensitivity of the testing equipment in anechoic chambers, it is important that the protrusion of metal objects into the chamber be minimized as much as possible. Thus, the design intent of anechoic chamber fire suppression systems was that the retracted TSAs and sprinkler heads would be concealed above the chamber ceiling and anechoic foam until activated. As designed, TSAs were intended to deploy through a hole would cut in the valley between pieces of anechoic foam, allowing the TSA an unobstructed deployment path in the event of activation.

20.     In 1985, FMRC hosted a conference at its Norwood, Massachusetts, headquarters, whose objective was to "exchange technical information so that Factory Mutual can produce a state of the art guideline for the protection of Anechoic Chambers and others can recognize the loss potential that exists and take steps to minimize loss." A number of anechoic chamber owners were invited to, and attended, this conference. A representative of Rantec was also present. At the time of this conference, water-based fire suppression systems in anechoic chambers were predominantly deluge systems. A number of incidents involving water damage to anechoic chambers resulting from the false activation of deluge systems were discussed at this conference.

21.     Although the difference between deluge and pre-action sprinkler heads was not viewed as having an impact on the RF reflectivity within anechoic chambers, or on fire suppression itself, FMIC viewed the pre-action sprinkler systems as beneficial to the interests of the FMIC because the pre-action sprinkler system was perceived by the FMIC and FMRC as presenting less potential for water damage to property in the event of an accidental triggering of the fire suppression system. Following the 1985 conference, and on information and belief,

FMRC and FMIC therefore sought to more vigorously promote and cause the use of pre-action sprinkler systems for anechoic chambers to be developed and to be incorporated into the anechoic chambers of their insureds, including Lockheed.

### FMRC Approval Of Rantec TSAs

22.     At all times relevant, Rantec is informed and believes that FMRC held itself out as an independent third-party testing laboratory service that for a fee endorses, approves and certifies the reliability of manufacturers' products and services, ensures the quality of manufacturers' products and services, and enhances the utility of manufacturers' products and services in the fire suppression industry while promising to its clients to use "sound engineering practices" and to make representations and report conclusions to its clients which represent the "best judgment of Factory Mutual."

23.     FMRC performs its approval and certification services through, *inter alia*, its own testing of manufacturer's products performed at its Massachusetts facility.  A manufacturer seeking FMRC approval of a product supplies exemplar products to FMRC and pays FMRC to conduct its approval testing.  Manufacturers seeking FMRC approval have no control over the nature, extent, scope, quality, or timing of FMRC's testing.  FMRC also inspects, audits, and approves, at the manufacturer's expense, the manufacturing facilities, manufacturing processes, and quality control procedures for products it approves.  Any change in facilities, processes or procedures must be disclosed to, and authorized by, FMRC.  FMRC also assists in the preparation, and approves, the owner's manual (including the operations and maintenance requirements) relative to the approved product.

24.     A product that successfully passes FMRC's multi-faceted approvals process is allowed to mark the product with FMRC's "Mark of Approval" and represent to the public that the product is FMRC "Approved."   Prior to being able to represent to the public that its product is FMRC Approved, the manufacturer is required to enter into an Approval Agreement that, on information and belief, contains, *inter alia*, the following provision:

"Client shall assume full responsibility for the design, material, workmanship and operation of the product or the quality of the service rendered and agrees to hold harmless and indemnify FMRC from any claims and liability to the Client or others for any kind or type of injury or damage, including without limitation, loss of earnings or profits, caused by or in any way connected with any of the services rendered by FMRC, or arising out of any defect, accident, damage or injury related to the product or serviced referenced herein."

25.    Beginning in or about the early 1980's, Rantec sought FMRC Approval of its TSAs for use in anechoic chamber fire suppression systems. The FMRC approval and certification process took several years, culminating in or about May 1990, with FMRC informing Rantec in writing that FMRC had completed testing of Rantec's TSAs for use in anechoic chambers and, referring to the completed testing, stated, "the results are satisfactory." The writing also stated that the Rantec TSAs would be granted formal approval after the issuance of an Approval Report and signing of an Approval Agreement by Rantec.

26.    Prior to FMRC's Approval of the Rantec TSAs for use in anechoic chamber fire suppression systems, any use of Rantec's TSAs had to be "Accepted" on a case-by-case basis by FMEA, in consultation with FMEA, FMRC and FMIC.

27.    FMRC issued its Approval Report for Rantec's TSAs in or about June 1991, which report presented the results of tests performed and reported by FMRC. The Approval testing conducted by FMRC was limited to the use of TSAs in preaction systems. One of the conditions of FMRC's Approval of the use of Rantec TSAs required the use of surge suppressors (to mitigate the effects of "air hammer" caused by the sudden increase in air pressure when the deluge valve is activated). Another condition of Approval required that Rantec's TSAs be "equipped with FMRC Approved Standard, SSU sprinklers, Central Model A or Star Model E." Further, FMRC also required that installation of the TSAs "shall conform to the guidelines specified in Factory Mutual Engineering Loss Prevention Data Sheet 1-53 S.2."

### FMRC's Relationship With FMIC

28.    At all times relevant, Rantec is informed and believes, and thereon alleges that Lockheed and its property insurers, including but not limited to, FMIC, relied upon the research

and recommendations of FMRC and/or FMEA which, in turn, insisted that their manufacturer clients, such as Rantec, pay for and obtain global product Approval or, alternatively, pay dramatically higher prices for certification services on a per-installation basis from FMEA prior to insuring any risk related to Lockheed's chambers.

29.      At all times relevant, FMRC, without full disclosure, and in a manner likely to deceive their clients, was not independent as it held itself out to be, but, rather, was owned, controlled, managed, and/or directed by, and operated in the interests of, FMIC which issued policies covering the end users, including Lockheed, of the same products and services tested, enhanced, modified, Approved and certified for use by FMRC on behalf of its client manufacturers, including Rantec.

30.      At all times relevant, FMRC, without full disclosure, while being held out as an independent testing service, and in a manner likely to deceive its clients and others, made decisions, recommendations, imposed requirements and modifications relating to its clients' products, which were not the result of sound engineering practices and did not represent the best judgment of Factory Mutual, and withheld information from their clients, the general public and the users of their clients' products, including test results and other data relating to the safety, reliability and suitability of those products and the use thereof, in an effort to further the interests of FMIC.

31.      At all times relevant FMRC, after having tested, enhanced, modified, and certified the products and services of its clients, deceptively and without disclosing the relationship of ownership, control, and direction between FMRC and FMIC and, in combination with FMIC, subjected its clients to potential subrogation actions by FMIC for defects, negligence or other related allegations in connection with the products or services that FMRC, and its successor FMGT, tested, enhanced, modified, and Approved.

**FMRC's Required Use Of Star And Central Sprinkler Heads And Surge Suppressors**

32.      For the purpose of, among other things, inducing Rantec to enter into an Approval Agreement with FMRC and to rely on FMRC's specific requirements, standards,

recommendations, approvals, and certifications, as to the utility and reliability of particular brands of components to be used in fire suppression systems for anechoic chambers, such as those located at Lockheed's Merrimack, New Hampshire facility, FMRC made certain representations regarding its testing of the utility and reliability of particular brands of components to be used in fire suppression systems utilizing Rantec TSAs.

33.    Although FMRC knew, but did not disclose to Rantec, that the use of pre-action sprinkler heads, as opposed to deluge sprinkler heads, would put greater water pressure on the Rantec TSAs and that no pre-action sprinkler heads had been designed or approved for use with a movable (as opposed to stationary) assembly such as TSAs, FMRC, on information and belief, nevertheless tested only pre-action sprinkler heads in conjunction with the Rantec TSAs.

34.    For the purpose of, among other things, inducing Rantec to enter into an Approval Agreement with FMRC, to rely on FMRC's specific requirements, standards, recommendations, approvals, and certifications, and for the purpose of making pre-action fire suppression systems available to FMIC's insureds, in addition to representing to Rantec that its testing was satisfactory, FMRC issued an Approval Report regarding Rantec's TSAs in or about 1991, purportedly based on testing performed by FMRC. Included in the Approval Report was a requirement that the Rantec TSAs be equipped with pre-action sprinkler heads, Central Model A or Star Model E, and be used in conjunction with FM Approved surge suppressors.

35.    By including the requirement that Rantec's TSAs be equipped with pre-action Central Model A or Star Model E sprinkler heads, a requirement purportedly based on testing by FMRC, and by representing that its testing results were satisfactory, FMRC represented that such products had been adequately and successfully tested utilizing sound engineering practices by FMRC for compatibility and suitability for use with Rantec TSAs and that such representations represented the best judgment of Factory Mutual.

36.    By including the requirement that fire suppression systems using Rantec's TSAs be provided with FMRC Approved surge suppressors, a requirement purportedly based on testing by FMRC, and by representing that its testing results were satisfactory, FMRC represented that

such products had been adequately and successfully tested utilizing sound engineering practices by FMRC for compatibility and suitability for use with Rantec TSAs and that such representations represented the best judgment of Factory Mutual.

37.    At all times relevant, Rantec was unaware of the falsity of the aforementioned representations.

38.    At the time of FMRC's representations regarding the Central Model A and the Star Model E, FMRC knew that the testing performed by FMRC on those sprinkler heads for use in conjunction with Rantec TSAs was non-existent or inadequate and that the testing indicated that the Central Model A and Star Model E sprinkler were not reliable for that use. FMRC did not disclose to Rantec the inadequacy of the testing performed or the results of that testing which indicated that the Central Model A and Star Model E sprinkler were not reliable for use with Rantec TSAs, yet conditioned the Approval of Rantec's TSAs on the use of such sprinkler heads.

39.    At the time of FMRC's representations regarding the FMRC Approved surge suppressors, FMRC knew that the testing performed by FMRC on surge suppressors for use in conjunction with Rantec TSAs was inadequate and did not disclose to Rantec the inadequacy of the testing performed or the results of that testing, yet conditioned the Approval of Rantec's TSAs on the use of such surge suppressors.

40.    Rantec reasonably relied on FMRC's representations regarding the reliability, compatibility and suitability of the Central Model A and Star Model E sprinkler heads in constructing Lockheed's chamber in Merrimack and by requiring, in, among other places, the operating manual for Rantec TSAs, that its TSAs be used in conjunction with the Central Model A and Star Model E sprinkler heads, and no others, and by signing an Approval Agreement with FMRC.

41.    Rantec reasonably relied on FMRC's representations regarding the reliability, compatibility and suitability of FMRC Approved surge suppressors in constructing turnkey anechoic chamber facilities, such as Lockheed's Tapered Range Chamber in Merrimack by requiring, in, among other places, the operating manual for Rantec TSAs, that its TSAs be used

in conjunction with FMRC Approved surge suppressors, and no others, and by signing an Approval Agreement with FMRC.

## FMRC'S Approval Guide

42.     From 1992 through at least 2001, FMRC published its Approval Guide, in which all Approved products were listed. For example, in 1991, Rantec's TSAs were listed as the only product in the section entitled: "Telescoping Sprinkler Assemblies For Use In Anechoic Chambers:"

> "Telescoping sprinkler assemblies are used to extend automatic or open sprinklers below the tips of the anechoic material in anechoic chambers. The assemblies are to be installed in accordance wit hthe manufacturer's directives and in compliance with Factory Mutual Engineering and Research Loss Prevention Data Sheet 1-53 S.2:
>
> **Rantec Microwave and Electronics, Inc. 24003 Ventura Blvd., Calabassas CA 91302**
>
> Model Nos. TFS-5, -12, -18, -24, -36, -42, -48, -54, -72, Max rated working pressure 150 psi (1034 kPa). Approved surge suppressors shall be used in accordance with manufacturer's instructions. When closed sprinklers are required, Approved upright Star Sprinkler Corp. Model E or Central Sprinkler Corp. Model A shall be used."

## FMIC and Lockheed Develop A Unique Deployment Method For Rantec TSAs

43.     After FMRC issued its May 1990 letter reporting that the Approval testing for Rantec's TSAs was satisfactory, Lockheed and FMIC developed a first of its kind and unique deployment method for Rantec TSAs in which the TSA was to pass through a cored-out section of the anechoic foam pyramids, rather than the valleys between the anechoic foam pyramids, requiring the TSAs with Approved sprinkler heads attached to push out a reinserted plug made up of absorber foam, solely for the purpose of improving chamber functioning. This unique deployment method was never subjected to a field test to assess the performance and reliability of this method, but was, instead, on information and belief, subjected to a single successful

experimental test (conducted under the supervision of Lockheed and FMIC, and paid for by Lockheed), involving one TSA, at Rantec's Calabassas, California, facility in February 1991.

44.        Based on this single experimental test, this unique deployment method was approved for use by FMIC and implemented at Lockheed's Large Compact Range Anechoic Chamber ("LCR") at its Sunnyvale, California, facility (where 195 Rantec TSAs had already been installed) and, on information and belief, at Lockheed's Tapered Range Anechoic Chamber in Merrimack, New Hampshire (where approximately 36 Rantec TSAs were installed), in or about 1991 and 1992, respectively.

45.        This unique deployment method without any testing or maintenance instruction resulted in a changed use of Rantec's product, to its detriment, because the TSA was made to force out the foam core upon deployment in this unique deployment method. This deployment method was not tested as a system where the foam cores were forced out, then replaced.

46.        On information and belief, that same unique deployment system was used in other anechoic chambers, with the knowledge of FMIC, but never disclosed to Rantec.

47.        FMIC knew, or should have known, that a single experimental test of a first of its kind and unique deployment method for the TSAs would not be sufficient to assess the reliability of such a method in practice and in the context of the installation requirements upon which the TSAs were approved, the periodic maintenance requirements set forth in the Rantec Manual, and the potential for the TSAs to adequately perform in case of a fire.

48.        FMIC knew, or should have known, that the Rantec Manual set forth specific maintenance requirements in the context of a method of deployment where the TSAs would deploy unobstructed through the valleys between pyramidal absorber foam sections and that the unique deployment method would require more cumbersome and expensive maintenance in order to comply with the Rantec Manual. Yet, despite its understanding that the unique deployment method would require specialized testing and maintenance, FMIC, as part of the deployment development process, never created, recommended, or suggested that Lockheed undertake any

specialized testing or maintenance in order to assure adequate performance of the TSAs if, and when, they were required to respond to a fire.

49.    FMIC worked with Lockheed to implement the unique deployment method at its Sunnyvale facility, but never, as part of the deployment development process, created, recommended, or suggested that Lockheed maintain and test the fire suppression system periodically, as instructed by the Rantec Manual, and when the unique deployment method failed, FMIC, as the lead subrogee to Lockheed, sued Rantec for damages caused when the unique deployment method caused the TSAs, or the sprinkler heads, to malfunction in response to the accidental activation of the fire suppression systems at the Lockheed Sunnyvale, California facility in 1996, and Merrimack, New Hampshire, facility in 1997.

## FIRST CLAIM FOR RELIEF

## COMMON LAW FRAUD (INTENTIONAL AND NEGLIGENT MISREPRESENTATIONS)

50.    Rantec hereby incorporates by this reference paragraphs 1 through 48 of this Counter-Complaint and makes them a part of the instant cause of action as though fully set forth herein

51.    Rantec is informed and believes, and thereon alleges, that FMRC made the aforementioned misrepresentations regarding the Approval testing it performed on surge suppressors and sprinkler heads with the intent to induce Rantec to enter into an Approval Agreement with FMRC whereby FMRC required that Rantec's TSAs be used in conjunction with specified surge suppressors and sprinkler heads in anechoic chamber fire suppression systems and to persuade Rantec to agree to certain liability provisions.

52.    Rantec is informed and believes, and thereon alleges, that FMRC made the aforementioned representations regarding the components knowing them to be false, or with no reasonable ground for believing that the representations were true.

53.    The Approval Agreement which Rantec was fraudulently induced into entering by FMRC's misrepresentations of fact regarding the testing performed by FMRC, purported to,

*inter alia*, absolve FMRC of all liability for the design, material, workmanship and operation of Rantec's TSAs, but no other components.

54.     Many of the above-mentioned actions originated by FMRC and FMIC in Massachusetts, including but not limited to, the signing of the Approval Agreement or Contract by FMRC. Many of the above-mentioned actions had an effect in California, including but not limited to the publication and circulation of FMRC's Approval Guide, the testing of the unique deployment method, and Rantec's signing of the Approval Agreement. These acts had an effect in California, because Rantec's principal place of business was located in California.

55.     FMIC knew or should have known that the unique deployment method FMIC approved for Rantec's TSAs, at the request of Lockheed, could not be tested, or maintained, in accordance with the Rantec Manual, nor did FMIC recommend or suggest that Lockheed follow the requirements for periodic testing and maintenance as set forth in the Rantec Manual. Yet, FMIC went forward with this system development at Lockheed's Sunnyvale and, on information and belief, Merrimack, and other Lockheed or FMIC insured's facilities as if it were a viable and reliable deployment system.

56.     Rantec reasonably relied on FMIC's fraudulent misrepresentations, as herein alleged, regarding development of this unique deployment system to continue to install absorber foam material, with cores and plugs, at other locations.

57.     As a further direct and proximate result of the fraudulent misrepresentations of FMRC and FMIC, Rantec has been injured in that Rantec was sued in subrogation by Lockheed for negligence and other causes of action related to the Sunnyvale, California and Merrimack, New Hampshire, incidents and had defended, and must continue to defend, those actions, has been exposed, and continues to be exposed, to other such actions, and has been forced to withdraw its TSAs from the market as a result of the aforementioned fraudulent misrepresentations. FMRC, moreover, now seeks a monetary award on the Approval Agreement with Rantec, notwithstanding said misrepresentations and Rantec must defend that and similar actions.

58.        FMRC and FMIC's actions as alleged above were oppressive, fraudulent and malicious within the meaning of California Civil Code Section 3294 and therefore entitle Rantec to punitive damages, in that FMRC and FMIC's aforementioned actions were despicable conduct done with a willful and conscious disregard for the rights of others.  FMRC and FMIC's actions as alleged above were fraudulent misrepresentations regarding the relationship between the two entities and the testing performed or not performed by FMRC to induce Rantec to enter into the Approval Agreement.  Those material facts were concealed from Rantec with the intention to deprive Rantec of its legal rights with regard to hold harmless and indemnity provisions within the Approval Agreement.  Due to the misrepresentations of FMRC and FMIC, Rantec is entitled to rescind the Approval Agreement.

**SECOND CLAIM FOR RELIEF**

**UNFAIR AND DECEPTIVE BUSINESS PRACTICES**

59.        Rantec hereby incorporates by reference paragraphs 1 through 57 of this Counter-Complaint and makes them a part of the instant cause of action as though fully set forth herein.

60.        At all times relevant, FMIC provided FMRC with the means to hold themselves out, in a manner likely to deceive their customers and the general public, as an "independent laboratory testing" service and did so with the knowledge that they were so holding themselves out in a deceptive manner.

61.        Rantec is informed and believes, and thereon alleges, that at all times relevant, FMRC was used and directed by FMIC to hold itself out as an independent laboratory testing service in a manner likely to deceive their customers, such as Rantec.

62.        At all times relevant, after collecting fees for services provided by FMRC, but before granting Approved status to their clients' products, and without previously disclosing that they would add a further condition to their approval, FMIC and FMRC, in an unfair and deceptive manner, and without any disclosure of the potential for FMIC to seek subrogation, required those manufacturing clients to agree to hold FMRC harmless for their Approval testing, including the aforepleaded misrepresentations and other associated conduct, by means of a

contract in violation of California's public policy as codified in Civil Code Section 1668, in a deceptive and unfair attempt to escape responsibility for their own affirmative conduct.

63.        Rantec has been injured in that it was sued by Lockheed for negligence and other causes of action and must defend that action, has been exposed and continues to be exposed to other such actions, and has been forced to withdraw its TSAs from the market as a result of the aforementioned unfair and deceptive business practices. FMRC, moreover, now seeks a monetary award on the Approval Agreement with Rantec, notwithstanding said unfair and deceptive business practices, and Rantec must defend that and similar actions.

64.        FMIC and FMRC threaten to continue and unless restrained will continue to engage in the aforementioned conduct.

65.        The aforementioned practices amount to fraudulent, unfair, and unlawful business practices as defined by Section 17200, et seq. of the California Business and Professions Code.

66.        Rantec therefore seeks rescission of the Approval Agreement between Rantec and FMRC, restitution of all fees paid by Rantec to FMRC, a permanent injunction enjoining FMIC from engaging in the aforementioned unfair, deceptive and anti-competitive business practices, notice to all entities which may be affected by the Approval Guide listings, and such other relief the Court deems appropriate.

## THIRD CLAIM FOR RELIEF

## FALSE ADVERTISING

67.        Rantec hereby incorporates by this reference paragraphs 1 through 65 of this Counter-Complaint and makes them a part of the instant cause of action as though fully set forth herein.

68.        By reason of FMRC holding itself out as an independent third-party testing laboratory service that for a fee approves and certifies the reliability of manufacturers' products and services, ensures the quality of manufacturers' products and services, and enhances the utility of manufacturers' products and services in the fire suppression industry, which was not true,

FMRC's actions constituted false advertising under California's Business and Professions Code Section 17500, et seq.

69.    By reason of FMRC's publishing of its Approval Guide from 1992 to at least 2003, in which it was represented that Approved Star and Approved Central sprinkler heads and Approved surge suppressors were acceptable for use with Rantec TSA's, FMRC's actions constituted false advertising under California's Business and Professions Code Section 17500, et seq.

70.    Due to the aforementioned false and fraudulent advertising by FMRC, as previously alleged, the general public was likely to have been deceived.

71.    The aforementioned practices amount to false advertising as defined by Section 17500, et seq. of the California Business and Professions Code.

## FOURTH CLAIM FOR RELIEF

## MASSACHUSETTS GEN. LAWS, CH. 93A

72.    Rantec hereby incorporates by this reference paragraphs 1 through 70 of this Counter-Claim and makes them a part of the instant cause of action as though fully set forth herein.

73.    The aforementioned acts by FMRC constitute a failure to disclose facts. The disclosure of those same facts may have influenced Rantec not to enter into the Approval Agreement with FMRC. Therefore, FMRC is in violation of Chapter 93A of the Massachusetts General Laws by its failure to disclose a fact, the disclosure of which may have influenced any person not to enter into a transaction.

74.    The aforementioned acts by FMRC, including the false representation of FMRC's status as an "independent" laboratory, when in fact it was not independent and the false representations regarding the testing of FMRC Approved surge suppressors and Approved Star or Central sprinkler heads for use in conjunction with Rantec's TSAs were untrue, unfair or deceptive acts or practices in violation of Chapter 93A of the Massachusetts General Laws.

75.        FMRC's publication of its Approval Guide from 1992 through at least 2003 containing the false representations regarding the testing of FMRC Approved surge suppressors and Approved Star or Central sprinkler heads, as detailed above, constitutes an unfair or deceptive act or practice in violation of Chapter 93A of the Massachusetts General Laws.

76.        The aforementioned acts by FMRC constitutes unscrupulous, intolerable and unethical behavior, which took place, substantially or in part in the Commonwealth of Massachusetts, and had an effect in the State of California. Rantec was damaged thereby.

WHEREFORE, Rantec prays for judgment against FMRC and FMIC as follows:

1.        For a permanent injunction enjoining FMRC from engaging in the aforementioned unfair, deceptive and anti-competitive business practices;

2.        For a permanent injunction enjoining FMRC from engaging in the aforementioned false advertising;

3.        For rescission of the Approval Agreement between Rantec and FMRC;

4.        For restitution of all fees paid by Rantec to FMRC;

5.        For restitution of all monies acquired by the aforementioned unlawful practices of FMRC;

6.        For compensatory and statutory treble damages in an amount to be proven at trial;

7.        For exemplary damages;

8.        For reasonable attorney's fees and costs; and

9.        For and other and further relief as the Court may deem proper.

THE DEFENDANT, PLAINTIFF IN COUNTER-CLAIM and THIRD PARTY

PLAINTIFF, RANTEC POWER SYSTEMS, INC., NOW KNOWN AS ETS LINDGREN,

L.P., DEMANDS A TRIAL BY JURY ON ALL ISSUES.

Respectfully submitted,
Defendant, Plaintiff in Counter-Claim,
and Third Party Plaintiff,
Rantec Power Systems, Inc.,
Now known as ETS Lindgren, L.P.,
By its attorneys,


Richard B. Kirby (#273600)
Matthew P. Zayotti, (# 638265)
Keegan Werlin LLP
265 Franklin Street
Boston, MA 02110
(617) 951-1400
(617) 951-1323 (facsimile)

Patrick J. Hagan (of counsel)
Dillingham & Murphy, LLP
225 Bush Street, 6th Floor
San Francisco, CA 94104-4207
(415) 397-2700
(415) 397-3300 (facsimile)


### Certificate of Service

I, Matthew P. Zayotti, hereby certify that I have on this 19th day of January 2006 served a copy of the foregoing document via first class mail, postage prepaid to Jonathan D. Mutch, Esquire, Robins, Kaplan, Miller & Ciresi, 111 Huntington Avenue, Suite 1300, Boston, MA 02199-7610.